# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 45980

LEILA R. BRAUNER, an individual, )
          )
          **Plaintiff-Respondent,** )
          )
v. )     **Boise, November 2019 Term**
          )
AHC OF BOISE, LLC, a Utah corporation, )     **Opinion Filed: February 4, 2020**
dba Aspen Transitional Rehab, )
          )     **Karel A. Lehrman, Clerk**
          **Defendant-Appellant,** )
          )
and )
          )
RICHARD E. MOORE, M.D.; SAINT )
ALPHONSUS REGIONAL MEDICAL )
CENTER, INC., an Idaho general nonprofit )
corporation, dba Saint Alphonsus Medical )
Group and dba Saint Alphonsus Regional )
Medical Center - Boise, and JASON S. )
LUDWIG, M.D., )
          )
          **Defendants.** )

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Melissa Moody and Gerald Schroeder, District Judges.

The judgment of the district court is affirmed.

Quane Jones McColl, PLLC, Boise, for appellant AHC of Boise, LLC. Matthew F. McColl argued.

Rossman Law Group, PLLC, Boise; and Alan Coffel, Coffel Law P.C., Nampa, for respondent Leila R. Brauner. Eric S. Rossman argued.

---

STEGNER, Justice.

This case involves a suit for medical malpractice brought by Leila Brauner against AHC of Boise, dba Aspen Transitional Rehab (Aspen). The claim arose out of Aspen's delay in sending Brauner to the hospital following her knee replacement surgery, which was a substantial factor resulting in the amputation of Brauner's right leg at the mid-thigh. After a trial, the jury entered a verdict in favor of Brauner and awarded her $2,265,204 in damages. Aspen appeals

1

alleging that various pre-trial and post-trial rulings were in error and resulted in an unsustainable judgment. For the reasons set out, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

**A. Brauner's surgery, rehabilitation at Aspen, and amputation of her right leg.**

At seventy-six years old, Brauner began experiencing significant pain in her right knee. In order to continue her independent life and to relieve the pain, Brauner underwent a total knee arthroplasty, which was performed by Richard Moore (Moore), an orthopedic surgeon. Brauner underwent the surgery on February 18, 2014. The surgery was performed at St. Alphonsus Regional Medical Center in Boise. Brauner was transferred from St. Alphonsus to Aspen for rehabilitation three days after the surgery. During her time at Aspen, Brauner experienced significantly more pain in her knee and could put little to no weight on her leg.

On March 3, 2014, Brauner had a post-operative appointment with Moore at which he observed swelling in her knee and numbness in her foot. Also at this appointment, Brauner had x-rays taken of her right leg. It is undisputed that a fracture in Brauner's femur was visible in the x-ray at the time. However, Moore failed to diagnose the fracture. Instead, he recommended that Brauner ice and elevate her leg to help with the swelling in her knee. Brauner then returned to Aspen for continued care and rehabilitation.

During her remaining time at Aspen, Brauner made little progress. On March 14, 2014, Brauner complained of increasing significant pain. In the early morning of March 15, 2014, Brauner began showing signs of confusion. Brauner's condition continued to worsen over the next twenty-four hours. At 3:03 a.m. on March 16, 2014, Brauner was noted to have noticeable confusion that was "increasing as the night" went on. The nursing notes indicated that Brauner's right foot curled inward and appeared to be limp. On March 17, 2014, at 12:20 a.m., Brauner's pulse was 126 beats per minute, a dramatic increase from her normal rate of 72. By 3:43 a.m., Brauner was still acting confused, attempting to get out of bed, and pushing the nursing assistant away. The nursing notes also indicated that Brauner's leg had "very tight edema" when it had only been trace edema previously. Additionally, the nursing notes indicated that there was massive bruising along the right lower extremity. Brauner expressed that she was in the worst pain of her life, and yelled, "just shoot me" to her caregivers. Brauner's nursing expert testified at trial that the observations made by Brauner's nurses were very concerning and should have warranted further investigation, including contacting a physician.

2

Brauner's final assessment at Aspen occurred at 5:28 a.m. on March 17, 2014. Brauner's leg was cold to the touch, her skin was pale, and she had no pedal pulse. Brauner insisted upon being transferred to the emergency department. At the emergency department, it was determined that the femoral fracture had completely severed the femoral artery. While attempts were made to save Brauner's leg, the right leg was ultimately amputated at mid-thigh on March 19, 2014.

**B.      Course of proceedings.**

On November 5, 2015, Brauner filed a medical malpractice claim against Moore, St. Alphonsus Medical Center, Aspen, and Dr. Jason Ludwig, the medical director at Aspen. Ludwig and St. Alphonsus Medical Center were later dismissed. District Judge Melissa Moody presided over the case from November 5, 2015, to January 18, 2018. Senior Judge Gerald Schroeder presided over the remainder of the case.[1]

Judge Moody issued an amended scheduling order pursuant to I.R.C.P. 16(a). According to the amended order, a jury trial was scheduled for February 13, 14, 15, 20, 21, and 22, 2018. This order also set forth deadlines for expert witness disclosures. Notwithstanding the order, the parties filed two separate stipulations to extend the deadlines. In the second stipulation, Brauner's expert witness disclosures were due November 1, 2017, and Aspen's expert disclosures were due December 15, 2017. While Judge Moody issued an order approving the first stipulation to extend the deadlines, there is nothing in the record to indicate that Judge Moody approved the second stipulation.

Brauner filed her expert witness disclosures on November 6, 2017. In that disclosure, Brauner disclosed, among other things, the following expert witnesses: Michelle Nielson Cook (Cook), a certified life care planner, and Moore, the doctor who performed Brauner's knee surgery. While this disclosure had been filed after the date agreed upon in the second stipulation, one of Aspen's former attorneys, Leslie Brown (Brown), stated in an affidavit that Aspen had stipulated with Brauner to extend the deadline to November 6, 2017. Although there is nothing in the record to suggest that the stipulation was filed with or approved by the court, the parties appear to have operated pursuant to the extended deadlines, as Aspen filed its expert disclosures five days after the date that was stated in the second stipulation.

---

[1] Aspen only challenges rulings made by Judge Schroeder. Accordingly, any reference to the district court refers to Judge Schroeder. Judge Moody will be referred to by name.

Brauner filed an amended expert witness disclosure on November 9, 2017. In her amended disclosure, Brauner expanded her disclosure of Moore's testimony to include that he intended to testify about what he would have done had he been informed of Brauner's condition on March 14, 2014.

The case went to trial beginning February 13, 2018. After a seven-day trial, the jury returned a verdict in favor of Brauner. The jury awarded Brauner $2,265,204.

Aspen appealed from the judgment entered against it. During the pendency of the appeal, Aspen filed several post-judgment motions, including motions to compel certain documents from Cook and a motion pursuant to I.R.C.P. 60(b)(3). In its I.R.C.P. 60(b)(3) motion, Aspen alleged that Brauner's attorneys committed misconduct and misrepresented their negotiations and settlement agreement with Moore. The district court denied this motion. Aspen filed an amended notice of appeal to include the district court's decision to deny Aspen's Rule 60(b)(3) motion.

## II. STANDARD OF REVIEW

On appeal, Aspen challenges the district court's decisions regarding expert witness testimony, evidentiary matters, and a motion for relief from judgment. This Court reviews all of the above matters for an abuse of discretion. *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 50–51, 995 P.2d 816, 820–21 (2000). This Court reviews a district court's evidentiary rulings under an abuse of discretion standard. *Id.* at 50, 995 P.2d at 820 (citing *Kozlowski v. Rush*, 121 Idaho 825, 827, 828 P.2d 854, 856 (1992)). These evidentiary rulings include decisions by the district court to admit or exclude expert witness testimony. *Id.* (citation omitted). "Error may not be predicated upon a ruling which admits or excludes evidence unless the ruling is a manifest abuse of the trial court's discretion and a substantial right of the party is affected." *Ballard v. Kerr*, 160 Idaho 674, 693, 378 P.3d 464, 483 (2016) (quotation and citations omitted).

Additionally, this Court reviews a district court's decision to deny a Rule 60(b)(3) motion under an abuse of discretion standard. *PHH Mortg. v. Nickerson*, 160 Idaho 388, 393, 374 P.3d 551, 556 (2016) (citation omitted).

In order to determine if the district court abused its discretion, this Court analyzes:

Whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason.

*Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018) (citation omitted).

4

## III. ANALYSIS

**A.  The district court did not err in its decisions regarding Cook's testimony and reports.**

During trial, Cook testified regarding Brauner's expected future expenses resulting from the amputation of her leg. Aspen appeals from three discrete decisions of the district court regarding Cook's testimony. Specifically, Aspen argues that the district court erred by: (1) allowing Cook to testify despite the lack of foundation for her testimony; (2) failing to exclude Cook's February 11, 2018, report as untimely; and (3) relying on representations from counsel instead of reviewing *in camera* the notes Cook made on her reports.

Brauner disclosed Cook in her initial disclosure of expert witnesses on November 6, 2017. The disclosure stated that Cook intended to testify regarding her projection of Brauner's future expenses, which were detailed in a life care plan. Cook had created an initial life care plan on January 12, 2017. She then spoke with Dr. Scott Bressler, Brauner's primary care provider, on January 17, 2017, regarding her findings. Based on that conversation, Cook prepared the next version of her life care plan on January 27, 2017. This January 27, 2017, report was the life care plan included in Brauner's initial expert witness disclosures, which were disclosed to opposing counsel in November 2017. On January 27, 2018, Cook faxed the January 2017 Report to Dr. Chad Hirose, the physician who performed Brauner's amputation, and discussed the report with him two days later. According to Cook, both physicians confirmed her findings.

Cook was deposed on February 2, 2018, by videoconference because Cook lived out of state. During her deposition, Cook mentioned that during her conversations with the physicians, she would make notes on her life care plan and use those notes to modify and create an updated life care plan. When Aspen's attorney asked Cook to read her notes into the record, Brauner's counsel objected on the basis that the notes were draft reports and were not discoverable under I.R.C.P. 26(b)(4). Aspen's attorney argued that the draft reports transformed into a discoverable document if the notes were the basis of the conversation with the physicians.

Following the deposition, Cook prepared her February 2018 Report. Although the January 2017 Report and February 2018 Report appear facially different, much of the material content remained the same. The most noteworthy changes included (1) a reduction to the medical

damages claimed,[2] (2) an additional note indicating that she had spoken with Hirose, and (3) some alterations of the footnotes. Further, the February 2018 Report also detailed the medical information Cook relied on when creating her report, all of which were disclosed in Brauner's expert witness disclosure. The projected future expenses remained materially the same, but increased slightly. However, the total damages sought in the February 2018 Report were less than the total damages claimed in the January 2017 Report.

Aspen received Cook's February 2018 Report on February 12, 2018, the day before the trial began. On February 19, 2018, in the middle of trial, Aspen filed a motion to exclude Cook's testimony for lack of foundation and because her opinions were insufficiently disclosed. Aspen also moved to strike Cook's February 2018 Report as untimely.

On February 20, 2018, before Cook testified, the district court held a brief hearing on Aspen's motions concerning Cook's testimony. During the hearing, Eric Rossman, one of Brauner's trial attorneys, made several representations to the district court that the report upon which Cook made notes was a draft report and not discoverable. Rossman stated that Aspen's counsel was able to "extensively question Ms. Cook in her deposition about any communication she had with Dr. Bressler."

The district court asked whether there was anything different in those notes from what was disclosed at the deposition. Rossman responded that there were no differences. The district court stated that it would rely on the representations made by counsel, but ordered that Cook's report, upon which she had made the "notes," be placed in a sealed envelope in case the district court needed to review the "notes."[3] Finally, the district court reserved its ruling concerning foundation.

Following the hearing, Cook took the stand and testified about Brauner's expected expenses in the life care plan. Brauner's attorney asked whether the amputation was a substantial factor in causing the expenses Cook had calculated, which Cook acknowledged was the basis for

---

[2] Prior to trial, Judge Moody limited Brauner's claim to medical damages incurred to those amounts that Brauner had actually paid, not the amount billed by the care provider. Although not an issue on appeal, this was in error considering a recent decision of this Court. *See Eldridge v. West*, No. 45214, 2019 WL 6974275, at *9 (Idaho Dec. 20, 2019).

[3] Cook's "notes" have caused much friction between the parties. This Court, through the clerk's office, ordered that Brauner provide a sealed copy of the Cook file. On September 17, 2019, Aspen filed a motion to unseal the Cook file. This Court denied the motion on October 18, 2019. It appears that the district court never reviewed the documents.

her projections. Aspen's attorney objected, arguing that Cook's testimony lacked foundation. Brauner's attorney responded that Cook confirmed with the physicians that the amputation was a substantial factor in causing each of the expenses in Cook's report.

Cook's February 2018 Report was eventually admitted and published to the jury. Aspen's counsel objected prior to its admission, arguing that the report lacked foundation as to the expense for Touchmark, an independent living facility. The district court denied the objection, but instructed Aspen's counsel that he could cross-examine Cook about the expense.

Following the trial, Aspen filed a motion to compel Brauner to produce Cook's "notes." Matthew Gunn, one of Brauner's trial attorneys, filed an *in camera* affidavit that identified the "notes" and edits that had been made on Cook's report. As Aspen appears to take particular issue with the expenses associated with Touchmark, the note that Aspen quotes with most frequency is "why not house maint[,]" which Aspen argues suggests Brauner could have remained in her home without the need of an independent living facility.

1. The district court did not err by concluding that Cook had the requisite foundation for her testimony regarding her life care plan.

During trial, the district court denied Aspen's objection that Cook lacked foundation for her testimony regarding Brauner's future expenses. On appeal, Aspen argues that Cook, as a "non-medically trained life care planner," was not qualified to testify about the medical necessity of the future expenses. Specifically, Cook failed to set forth the foundation that the future expenses would be medically necessary as a function of the amputation, rather than another cause, such as Brauner's advanced age.

This Court reviews a district court's decision to admit an expert witness's testimony under an abuse of discretion standard. *Herrett v. St. Luke's Magic Valley Reg'l Med. Ctr.*, 164 Idaho 129, 132, 426 P.3d 480, 483 (2018) (citation omitted). The admissibility of expert testimony is governed by I.R.E. 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

I.R.E. 702. Further, the trial court must consider I.R.E. 703, which provides, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion or inference on the subject, they need not be admissible for the opinion to be admitted."

To determine if the district court abused its discretion, this Court analyzes:

7

> Whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason.

*Lunneborg*, 163 Idaho at 863, 421 P.3d at 194 (citation omitted).

Aspen contends that the district court erred by allowing Cook's testimony because Cook did not have the proper medical expertise to testify that the amputation was a substantial factor of the future expenses. Aspen cites cases from several jurisdictions for the proposition that life care plans must be supported by *medical* expert testimony. Additionally, Aspen alleges that Cook was merely "parroting" the expert opinions of Bressler and Hirose, which is not allowed under I.R.C.P. 26 and I.R.E. 702.

While it is true that a few jurisdictions require life care reports to be supported by medical evidence, *see, e.g.*, *Wright v. Am. Home Prods. Corp.*, 557 F. Supp. 2d 1032, 1038–39 (W.D. Mo. 2008) (citation omitted), other jurisdictions have held that a life care planner's testimony is admissible if the expert is qualified in life care planning. *See, e.g.*, *Marcano Rivera v. Turabo Med. Ctr. P'ship*, 415 F.3d 162, 171 (1st Cir. 2005). Further, many of these jurisdictions have found that life care planners have the requisite foundation to support their testimony, if the testimony is based on a review of medical records and confirmation from a doctor. *See id.*; *M.D.P. v. Middleton*, 925 F. Supp. 2d 1272, 1275 (M.D. Ala. 2013).

While this Court has limited case law on the admissibility of a life care plan, we recently affirmed the admission of a life care plan in *Herrett*, 164 Idaho at 136, 426 P.3d at 487. In *Herrett*, this Court held that the district court did not abuse its discretion by admitting an expert's life care plan because the expert reviewed the plaintiff's medical record and consulted with other healthcare providers. *Id.* This Court affirmed the admission of the expert's testimony even though the expert never consulted with the plaintiff's treating physician. *Id.* Additionally, this Court reasoned that the defendant failed to demonstrate that life care planners do not typically rely on this type of evidence. *Id.*

Based on this Court's decision in *Herrett*, Idaho law aligns with those jurisdictions that review the expert's qualifications and the records relied upon by the expert to determine whether the expert can establish the necessary foundation. Here, Cook had extensive qualifications as a life care planner. Cook's curriculum vitae disclosed that she is a registered nurse and certified life care planner, and holds numerous other related certifications. Additionally, Cook has

published articles and presented on life care plans and rehabilitation. Also, Cook has been a life care planner since 1987. Accordingly, Cook had the requisite experience and training in life care planning sufficient to qualify her to testify regarding Brauner's future expenses.

Cook's foundation is similar to the expert's foundation in *Herrett*. First, like the life care planner in *Herrett*, Cook reviewed Brauner's medical records. *See Herrett*, 164 Idaho at 136, 426 P.3d at 487. Brauner's disclosure of Cook as an expert stated that Cook relied on "medical records for Primary Health; medical records and bills for Ada County Paramedics; medical records and bills for St. Luke's Regional Medical Center; medical records and bills for St. Luke's Rehabilitation Hospital; medical records for Les Bois Neurology; [and] medical records and bills for St. Luke's Ada Medical Associates." Further, Cook went a step further than the expert in *Herrett*, and spoke with Brauner's primary physician, Bressler. *Id.*

Like the medical defendant in *Herrett*, Aspen never disputed the methodology used by Cook to draft her life care plan, despite having a rehabilitation expert of its own. *See id.* During trial, Cook testified that it was her typical methodology to create a life care plan and then consult with the treating physicians regarding her projection of future expenses. She testified that all the resources she used were of the type "reasonably relied upon by life-care planning experts." Instead of disputing the methodology used, Aspen's expert seemed to *confirm* the methodology utilized by Cook.

Next, Aspen contends that Cook was simply "parroting" the opinions of Bressler and Hirose when she testified that the amputation was a substantial factor of Brauner's future expenses. However, Cook was not merely "parroting" Bressler and Hirose. Cook stated that Bressler and Hirose concurred with the findings she made after reviewing Brauner's medical history. Cook testified that this was her typical methodology when creating a life care plan. She testified that all the resources she used were "reasonably relied upon by life-care planning experts." Cook did not merely "parrot" Bressler and Hirose. Rather, she testified that they both *confirmed* her life care plan.

Accordingly, the district court did not abuse its discretion in determining that Cook had the foundation necessary to testify regarding future expenses.

9

2. The district court did not err when it denied Aspen's motion to strike Cook's February 2018 Report as untimely.

Aspen alleges that the district court erred when it failed to strike Cook's February 2018 Report. Aspen contends that the report was "grossly late, there was no substantial justification for the lateness, and the lateness was harmful."

Brauner argues that while it is true that the report was filed on the eve of trial, the late filing was both harmless and substantially justified. Further, Brauner noted that she had an obligation to update her initial disclosure if portions of her expert's opinions had been rejected or altered in some manner.

Although I.R.C.P. 16(a)(3) states that deadlines set in the scheduling order "must not be modified except by leave of the court on a showing of good cause or by stipulation of all the parties and approval of the court[,]" the Idaho Rules of Civil Procedure also anticipate supplemental disclosures. For example, I.R.C.P. 26(e)(2) provides "[a] party must supplement in a timely manner . . . the subject matter on which the [expert witness] is expected to testify, and the substance of the person's testimony."

Failure to supplement, if required, permits the district court to exclude the expert's testimony. I.R.C.P. 26(e)(3). Additionally, I.R.C.P. 37(c)(1) allows a district court to impose sanctions for failure to disclose or supplement. That rule states,

> [i]f a party fails to supplement discovery responses when required or fails to comply with a disclosure requirement ordered by the court pursuant to a Rule 16 scheduling . . . order, the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, *unless the failure was substantially justified or is harmless.*

I.R.C.P. 37(c)(1) (italics added).

Here, although the district court provided little reasoning on the record for its ruling, the late supplementation of Cook's report was both substantially justified and harmless. Brauner disclosed Cook's January 2017 Report on November 6, 2017. As the report was disclosed on the date that was agreed upon between the parties, the report was timely.[4] The report set forth claimed damages that totaled $1,366,749 ($547,850 in past medical expenses and $818,899 in future expenses). Cook's supplemental February 2018 Report lowered the total claimed damages to $1,132,602 ($298,125 in past medical expenses and $834,477 in future expenses).

---

[4] Although it is true that the district court never approved the extended deadlines, it appears that all parties were operating pursuant to the agreement. Therefore, Aspen cannot claim error when it also filed its initial disclosures after the court's last-approved deadline.

The admission of the February 2018 Report was harmless. The supplemental report *reduced* Brauner's total damages sought by $234,147. It is unclear why Aspen would have wanted Cook's February 2018 Report stricken as it would have left Aspen dealing with the timely January 2017 Report, which claimed $234,147 more in damages. As a result, Aspen was not harmed by the admission of Cook's February 2018 Report. In fact, Aspen benefited from the late report.

Further, Cook's disclosure on February 12, 2018, was substantially justified. The Idaho Rules of Civil Procedure require a party to update and supplement its expert disclosures or risk exclusion of the expert at trial. I.R.C.P. 26(e)(2); *Edmunds v. Kraner*, 142 Idaho 867, 874, 136 P.3d 338, 345 (2006) ("Idaho law specifically contemplates that expert testimony can change after the initial disclosure."). This Court has held that Rule 26 "unambiguously imposes a continuing duty to supplement responses to discovery with respect to the substance and subject matter of an expert's testimony where the initial responses have been rejected, modified, expanded upon or otherwise altered in some manner." *Clark v. Klein*, 137 Idaho 154, 157, 45 P.3d 810, 813 (2002) (quotation omitted).

It is undisputed that Cook's February 2018 Report was disclosed on the eve of trial, after Cook was deposed. While it can be problematic to have an expert's report filed on the eve of trial, Cook's January 2017 Report required revision because Judge Moody ruled that Brauner had to limit her requested medical expenses to those actually *paid* as opposed to those *billed*.

Accordingly, the district court did not abuse its discretion because Cook's late disclosure was necessitated by Judge Moody's ruling. In addition, and importantly from the standpoint of harmlessness, Aspen benefited from the changes in the report because the damages sought were *reduced*.

3. The district court abused its discretion by relying on the representations of counsel to determine that Cook's notes were a draft report; however, any error was harmless.

Aspen's counsel deposed Cook eleven days before trial. Cook was deposed via videoconference. During the deposition, Cook mentioned that she had consulted with Bressler and Hirose. Cook also made several comments about "notes" she had made regarding those conversations. Aspen's counsel asked Cook to read those notes into the record; however, Brauner's counsel objected on the basis that the notes constituted a draft report or constituted other privileged information protected by I.R.C.P. 26(b)(4). Brauner's counsel stated that Aspen was free to inquire about the discussions that Cook had with Bressler and Hirose. During the

remainder of her testimony, Cook stated that she did not remember the exact details of her conversations with Bressler and Hirose besides what was contained in her notes.

As noted above, Aspen's counsel objected to Cook's testimony because she purportedly lacked the necessary foundation. During the hearing regarding foundation, Cook's notes were referenced several times. The argument eventually became whether the notes that Cook had made on her reports constituted a draft report under I.R.C.P. 26(b)(4) or if they were discoverable and should have been disclosed at the time Cook was deposed. The following conversation occurred during the hearing, which appears to be the basis for Aspen's claim of error:

> [by ERIC ROSSMAN]: It's an initial report that [Cook] prepared in the case. That's why that part was not produced.
>
> And they were allowed to extensively question Ms. Cook in her deposition about any communication she had with Dr. Bressler. And that information was provided. But the problem with providing this at the deposition was it contained other things that constituted a draft report.
>
> So they were allowed to have the information. They got the information, everything about any conversation Cook had with Dr. Bressler, but they were not provided the draft report itself. And there's no other notes other than what's in this preliminary report.
>
> THE COURT: I'll rely upon the representations of counsel.
>
> Is there anything different in those notes than what was disclosed at the deposition?
>
> . . . .
>
> [A. by MATTHEW GUNN]: No, Your Honor.

Following this exchange, the district court instructed Brauner's counsel to place the notes in a sealed envelope, in case it was determined that the notes needed to be reviewed.

Although not entirely clear from Aspen's briefing, it appears that Aspen claims that the district court erred by not determining that Cook's "notes" were not a draft report, and therefore should have been discoverable. Then, Aspen contends that the district court abused its discretion by not reviewing the notes in order to determine whether the notes *actually* constituted a draft report; instead, the district court merely relied on the representations of Brauner's counsel regarding the notes.

I.R.C.P. Rule 26(b)(4)(B) explicitly excludes draft reports from discovery by an opposing party, allowing experts to revise and edit their reports prior to the disclosure of final reports. This

Court has not had the opportunity to address what constitutes a "draft report" for the purposes of Rule 26(b)(4)(B). Consequently, we turn to the federal version of Rule 26(b)(4)(B).

"When a federal rule is identical in material respects to an Idaho rule, this Court may consider decisions of the federal courts interpreting the federal rule when interpreting the Idaho rule." *Hoffer v. Shappard*, 160 Idaho 868, 874, 380 P.3d 681, 687 (2016) (citations omitted). Federal Rule of Civil Procedure 26(b)(4)(B) states, "Rules 26(b)(3)(A) and (B) protect drafts of any report or disclosure required under Rule 26(a)(2), regardless of the form in which the draft is recorded." This language varies from the Idaho rule, but the material requirements of the rule are the same.

An Arizona federal district court has articulated a test that federal district courts should use when determining whether a document is a draft report:

> When it comes to applying the rule, there is little case law to help the [c]ourt "distinguish between notes which are simply a compilation of information for possible later use in a case, and notes which truly are part of the draft of a final expert report." In the absence of a "bright-line standard," *courts attempting to determine if material is protected as a draft report have applied a fact-dependent inquiry.* In conducting this inquiry, whether or not the documents at issue are labeled "draft report" or "witness interview notes" or something else entirely is irrelevant. Additionally, whether the documents are a draft of an entire report rather than a portion thereof is also an irrelevant distinction. *Factors that may be relevant in determining whether the documents are a draft report include whether the documents were created for the purpose of being included in the final report, and whether they were actually included in earlier versions of the report.*

*Salazar v. Ryan*, No. CV-96-00085-TUC-FRZ, 2017 WL 2633522, at *2 (D. Ariz. June 19, 2017) (italics added) (internal citations omitted); *see also Deangelis v. Corzine*, 2016 WL 93862, at *5 (S.D.N.Y. 2016) (explaining that it was relevant that the documents had in fact been created for use in the expert's report, and that the expert anticipated that the documents would form a part of the report he was drafting).

Here, it is not apparent from the transcript that the district court truly grappled with whether or not Cook's notes constituted a draft report. Instead, the district court appears to have concluded that Cook's testimony was properly disclosed because there was no difference in the notes that Cook made at trial and what was disclosed at the deposition. This constituted error. As noted in *Salazar v. Ryan*, the district court should have engaged in a fact-driven analysis to determine if the "notes" constituted a draft report, using such factors as articulated in the *Salazar* case. *See Salazar*, 2017 WL 2633522, at *2. Further, the district court should have reviewed the

notes *in camera* to engage in this fact-finding analysis, rather than rely on representations of counsel. *See id.* As the district court did not apply the correct standard to determine whether the notes were discoverable, the district court abused its discretion. A district court fails to recognize the outer bounds of its discretion if it fails to state or apply the correct legal standard. *See Crowley v. Critchfield*, 145 Idaho 509, 513, 181 P.3d 435, 439 (2007).

However, "[t]he court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." *Ballard*, 160 Idaho at 696, 378 P.3d at 486 (quoting I.R.C.P 61). Here, any error was harmless. First, Cook referenced that she discussed her reports with Bressler in her January 2017 Report, which was disclosed to Aspen on November 6, 2017. Aspen was given ample time to contact or depose Bressler regarding any discussions he had with Cook. Further, Cook was deposed near the time of trial, giving Aspen an opportunity to question her regarding the necessity of the Touchmark expense. While there is an oblique reference to "why not house maint[,]" in Cook's materials, the uncontradicted evidence showed that Brauner had been unsuccessful in living on her own. Consequently, at trial, no one was realistically arguing that a woman of Brauner's age could be living on her own as an amputee. In addition, Aspen had the opportunity to cross-examine Cook at trial. Because the error was harmless, we find no reversible error.

In sum, we affirm the district court's decisions that allowed Cook to testify regarding her projection of Brauner's future expenses and the introduction of her February 2018 Report.

**B.      The district court did not commit reversible error when it allowed Moore to testify.**

   1. The district court did not abuse its discretion in allowing Moore to testify because the late disclosure was harmless.

Aspen next alleges that the district court abused its discretion when it allowed Moore to testify during Brauner's case-in-chief. During trial, Moore testified that an orthopedic surgeon would have been concerned by Brauner's condition on March 16 and 17, 2014. Moore testified that had Aspen notified him of Brauner's condition, he would have ordered that she be transferred to the emergency room. Had she been transported to the emergency room sooner, her leg would not have been amputated.

Brauner filed her disclosure of Moore on November 6, 2017. As noted above, this appears to be the date agreed upon by the parties. Brauner's disclosure of Moore stated, "Dr. Moore is a percipient witness who has not been retained to testify as an expert witness for

14

[Brauner] in this case. Dr. Moore will testify in a manner consistent with his dictated medical notes and chart records relating to the care and treatment of [Brauner]."

Brauner amended her disclosure of Moore's expected testimony on November 9, 2017. The amended disclosure contained the same statement indicated above, but added that

> Dr. Moore will also testify at trial that had he been contacted following the nursing note entries on March 14, 2014, through March 17, 2014, more likely than not, he would have immediately referred [Brauner] to the emergency department. Dr. Moore will further testify at trial that the community standard of care in March of 2014 required immediate communication to the physician followed by immediate referral to the emergency department.

Aspen objected to Moore's testimony regarding what he would have done if he had been informed of Brauner's condition. At trial, Aspen's counsel stated that the objection was based on I.R.C.P. 26 and 16. The district court overruled Aspen's objection.

On appeal, Aspen alleges that the district court abused its discretion because it failed to apply the correct legal standards pursuant to I.R.C.P. 26. Aspen contends that Moore's direct expert testimony was untimely and insufficient under I.R.C.P. 26(b)(4)(A)(ii). Alternatively, Aspen argues that Brauner should have disclosed Moore as a retained expert witness, but failed to do so.

For non-retained experts, a party is required to disclose "a statement of the subject matter on which the witness is expected to present evidence under Rule 702, 703 or 705, Idaho Rules of Evidence, and a summary of the facts and opinions to which the witness is expected to testify." I.R.C.P. 26(b)(4)(A)(ii). The timing for these disclosures is set out in the district court's scheduling order. I.R.C.P. 16(a)(2)(B).

Brauner's disclosure of Moore satisfied the disclosure requirements of I.R.C.P. 26(b)(4)(A)(ii). Brauner's amended disclosures clearly identified the scope of Moore's testimony. The amended disclosure stated that Moore intended to testify "that had he been contacted following the nursing note entries on March 14, 2014, through March 17, 2014, more likely than not, he would have immediately referred [Brauner] to the emergency department." Accordingly, the content of disclosure was enough to satisfy the disclosure requirements under I.R.C.P. 26(b)(4)(A)(ii).

Aspen also argues that the November 9, 2017, disclosure was untimely. During the proceedings below, Aspen appeared to be acting on the assumption that the November 9 disclosures were untimely, and therefore irrelevant. In objecting to Moore's testimony, Aspen

15

seems to ignore Brauner's November 9 disclosures. Instead, Aspen spends significant time in its trial briefing arguing that Brauner's inclusion of Moore as a *rebuttal witness* was inappropriate. Aspen argued that Moore's rebuttal testimony regarding the community standard of care was only relevant in Brauner's case in chief. Accordingly, Aspen contended that Moore's testimony regarding the community standard of care should have been excluded because it was not properly disclosed. However, Moore's rebuttal disclosure was materially identical to the November 9 disclosure. The district court denied Aspen's objection because Moore's testimony was properly disclosed as a witness for Brauner's case in chief on November 9, 2017.

Notably, Moore was not called as a rebuttal witness. Accordingly, we review whether the district court erred in not excluding Moore's testimony because the November 9, 2017, disclosure was untimely. I.R.C.P. 37(c)(1) grants a court discretion to impose sanctions, including exclusion of the expert's testimony, for violations of a Rule 16 scheduling only when the violation is neither "substantially justified nor harmless."

As noted above, it was never clearly articulated to the district court that Aspen was objecting to Moore's testimony as improperly disclosed under I.R.C.P. 26 as it relates to the November 9, 2017, disclosure. Further, it is true that the November 9, 2017, disclosure was filed after the parties' agreed upon deadline of November 6, 2017. However, the untimely disclosure of Moore was harmless. The date of the amended disclosure, November 9, 2017, was the next business day after November 6, 2017. It cannot be said that Aspen was prejudiced by this late disclosure, as the late disclosure was available to Aspen prior to Moore's deposition and well in advance of trial. As a result, Aspen was able to prepare an adequate defense to any testimony by Moore regarding what he would have done had he been informed of Brauner's condition. Accordingly, the district court did not abuse its discretion in allowing Moore to testify because the untimely disclosure by one business day was harmless.

Aspen contends it was treated differently than Brauner because Aspen had a witness excluded for untimely disclosure, but Brauner was allowed to have Moore testify even though his testimony was arguably untimely. It is true that Aspen's expert, Dr. Titcomb, was excluded while Brauner's expert, Moore, was not. However, there is an explanation for the district court's disparate treatment of these witnesses. Brauner specifically filed a pre-trial motion to exclude Titcomb. By contrast, Aspen submitted a trial brief that devoted a section to its concerns regarding Moore's disclosure as a rebuttal witness. While Aspen objected to Moore's testimony

16

and disclosures during his deposition on January 18, 2018, it was only brought to the district court's attention during Moore's testimony *at trial*, rather than through any pretrial motion. In addition, Moore was a percipient witness, who was a named defendant until shortly before trial. It could not have come as a surprise to Aspen that Moore would testify. On the other hand, Titcomb was retained to testify about life expectancy and other damage issues. Regardless, given the important differences between Moore and Titcomb, the district court did not abuse its discretion in overruling Aspen's objections. Accordingly, we affirm the district court's decision to allow Moore to testify.

2. Whether Brauner should have disclosed Moore as a retained expert witness, rather than a percipient witness, was never raised below.

Alternatively, Aspen argues that Brauner was required to disclose Moore as an expert witness rather than as a percipient witness. However, there is no evidence in the record that this issue was ever raised to the district court. It is the long-standing rule of this Court that it will not address an issue that is raised for the first time on appeal. *Valiant Idaho, LLC v. VP Inc.*, 164 Idaho 314, 328, 429 P.3d 855, 869 (2018) (quotation omitted). Because this issue was not properly preserved, we will not address it.

**C.** **The district court did not commit reversible error by excluding any evidence regarding the settlement agreement between Moore and Brauner.**

Moore signed a settlement agreement with Brauner on January 4, 2018. Because of this agreement, Moore was dismissed as a defendant from the case on January 30, 2018. Aspen filed a motion to compel Brauner to provide the settlement agreement between Brauner and Moore. The district court ordered that Brauner provide Aspen a version of the settlement agreement with the settlement amount redacted.[5]

During trial, Aspen moved the district court to allow Aspen to cross-examine Moore regarding the fact of the settlement agreement. In denying Aspen's motion, the district court stated,

---

[5] During a post-trial hearing, the district court ordered Brauner's counsel to provide the district court with an unredacted version of the settlement agreement. The district court requested the unredacted version of the settlement agreement to determine whether anything in the agreement would require the district court to offset any of the judgment. The unredacted version of the settlement agreement was provided to this Court as an exhibit. However, there is no evidence that the agreement was ever made part of the official appellate record. As Aspen did not appeal the district court's decisions about redacting the agreement or declining to offset the judgment, the unredacted version appears to be irrelevant for the purposes of this appeal.

[w]hat I was looking for in my inquiry was if there were elements of bias that were going to be developed that would make this clear that this might be a tipping point on credibility. I haven't heard that.

It appears to me that what I'm hearing, at this point, is a question more of causation now, when and where and what happened, than bias by this witness. And the settlement agreement was produced. I find within its terms nothing that either encourages or discourages testimony by this witness.

And so I will deny the effort to offer the settlement agreement into this case.

On appeal, Aspen argues that the district court abused its discretion by excluding evidence of the settlement agreement. Aspen alleges that the district court inappropriately focused on the specific language in the agreement rather than the fact of the agreement on its own.

The district court has broad discretion in determining the admissibility of evidence regarding settlement agreements, and its decision will not be overturned absent an abuse of discretion. *Quick v. Crane*, 111 Idaho 759, 780, 727 P.2d 1187, 1208 (1986) (citation omitted). In order to determine if the district court abused its discretion, this Court analyzes:

Whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason.

*Lunneborg*, 163 Idaho at 863, 421 P.3d at 194 (citation omitted). A district court fails to recognize the outer bounds of its discretion if it fails to state or apply the correct legal standard. *See Crowley*, 145 Idaho at 513, 181 P.3d at 439.

Idaho Rule of Evidence 408 prohibits evidence of compromises when offered "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction[.]" However, the rule does not prohibit the admission of compromises if offered for another purpose "such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." I.R.E. 408(b). Settlement agreements may be introduced to impeach or prove bias. *Id.*; *Davidson v. Beco Corp.*, 114 Idaho 107, 109, 753 P.2d 1253, 1255 (1987).

Under I.R.E. 408, if a settlement agreement is offered for a purpose other than "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction" then there is no prohibition on the admission of the settlement

18

agreement. I.R.E. 408(b). Instead, the district court must analyze the evidence under I.R.E. 403 to determine whether the evidence's "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." I.R.E. 403.

The district court abused its discretion when it refused to admit the fact of a settlement agreement because it articulated and applied the wrong standard. *See Crowley*, 145 Idaho at 513, 181 P.3d at 439. Here, Aspen offered the settlement as evidence of Moore's bias and to impeach his credibility. As this is an accepted use of evidence of a settlement agreement, the district court should have engaged in a Rule 403 analysis. Instead, the district court focused on the actual content and language of the settlement agreement to determine its admissibility. The district court stated, "I find within its terms nothing that either encourages or discourages testimony by this witness." However, this was not the proper analysis. Generally, the content of the agreement is only relevant if the agreement is a "Mary Carter Agreement."[6] Accordingly, the district court abused its discretion when it excluded evidence of the settlement agreement.

"Idaho courts are to 'disregard all errors and defects that do not affect any party's substantial rights.'" *Matter of Doe*, 163 Idaho 565, 571, 416 P.3d 937, 943 (2018) (quoting I.R.C.P. 61). "Consequently, because an appellant can only prevail if the claimed error affected a substantial right, the appellant must present some argument that a substantial right was implicated." *Id.* (quoting *Hurtado v. Land O'Lakes, Inc.*, 153 Idaho 13, 18, 278 P.3d 415, 420 (2012)).

Here, any abuse of discretion did not affect Aspen's substantial rights. Based on the theories upon which the case was tried, we cannot conclude that Aspen's substantial rights were affected. There were many things that Aspen could have done but did not at trial. First, Aspen could have resisted Moore's dismissal from the case. Aspen apparently expected to defend the case jointly with Moore. However, when Moore settled, Aspen was seemingly caught unprepared to attribute comparative negligence to its former codefendant. Second, once Moore was dismissed from the case, Aspen could have asked for a continuance or to have Moore placed back on the verdict. It did neither. However, without Moore on the verdict, Aspen did not have

---

[6] "A 'Mary Carter' agreement has three characteristics: (1) the agreeing defendant promises to remain a party until a verdict is reached or it has been released by the trial court or plaintiff; (2) the agreeing parties agree to keep the agreement secret; and (3) the agreeing defendant guarantees a certain recovery for the plaintiff." *Perry*, 134 Idaho at 57 n.2, 995 P.2d at 827 n.2 (citation omitted).

the ability to attribute comparative negligence to Moore. Moore's comparative negligence was irrelevant to the case that Aspen tried. Viewing the record from our vantage point, it appears the district court was attempting to limit the presentation of evidence to the pleadings. Because Moore was no longer a party to the case and Aspen never sought to attribute comparative negligence to Moore or have him named on the verdict, we conclude the district court did not commit reversible error in its ruling regarding Moore's settlement with Brauner. Accordingly, exclusion of the settlement agreement did not affect Aspen's ability to defend its case because Moore was no longer a party.

Although the district court abused its discretion by refusing to admit the fact of the settlement agreement's existence by failing to apply the appropriate test, any error was harmless and did not affect Aspen's substantial rights. As a result, we find no reversible error and affirm the district court's decision to exclude evidence of the settlement agreement.

**D. The district court did not err in denying Aspen's Rule 60(b)(3) motion because there was not clear and convincing evidence of misconduct or that Aspen was unable to fully and fairly defend its case.**

Aspen filed an I.R.C.P. 60(b)(3) motion, alleging that Brauner had misrepresented her interactions and settlement with Moore. Aspen argued that Brauner failed to disclose that Moore agreed to testify against Aspen as part of his agreement with Brauner. Aspen bases this argument on the following timeline of events.

On October 26, 2017, Brauner informed Aspen that she had reached some type of agreement with Moore. On November 6, 2017, Brauner filed her expert witness disclosures and listed Moore as a "percipient witness." One business day later, on November 9, 2017, Brauner supplemented her disclosure of Moore, stating that Moore would testify regarding the standard of care. There was no mention of a settlement agreement in either of these disclosures.

On October 30, 2017, Moore's attorney sent an email to Aspen that stated that Moore remained a defendant in the case and no settlement had been finalized. However, Moore's witness disclosure deadline came and went without Moore disclosing any expert witnesses, even though Moore remained a defendant in the case.

On January 2, 2018, Brauner served her second supplemental discovery responses, making no mention of the pending settlement agreement between Moore and Brauner. On January 4, 2018, Brauner executed a settlement agreement with Moore.

20

On January 10, 2018, Brauner served her third supplemental discovery responses. Despite finalizing an agreement mere days before, Brauner did not disclose this settlement agreement. At a hearing on January 16, 2018, Aspen raised concerns regarding Moore's status in the case, and whether settlement between Brauner and Moore had occurred. Brauner's counsel stated that Moore was still a party but a settlement agreement had been reached and a stipulation to dismiss Moore would be filed by the end of the week.

Two days later, Moore was deposed on January 18, 2018. During his deposition, Moore stated that had he been told of Brauner's condition, he would have ordered that she be sent to the emergency department. On January 24, 2018, Brauner stipulated to Moore's dismissal.

Aspen contends that this timeline of events demonstrates that Brauner misrepresented her interactions with Moore. Aspen maintains that it is important to note that it is only *after* Moore made adverse testimony against Aspen that Brauner finally stipulated to his dismissal. Aspen alleges the conduct by Brauner and Moore evidenced that there was a *quid pro quo* arrangement that Brauner would dismiss the claims against Moore if he testified against Aspen. Accordingly, Aspen argues it should be relieved from the judgment entered against it.

The district court, ruling from the bench, denied Aspen's Rule 60(b)(3) motion. The district court stated,

> What I have is an affidavit or affidavits that say there was no agreement, that there was nothing that made this witness a plaintiff's witness, as such. He was a treating physician. I would have to take inference based upon inference to conclude that he was acting for reasons other than what he represents and what counsel represents.
>
> I can't do it. And in the context of this case -- again, I don't know if has [sic] any weight or not. But the -- there was a fair opportunity to confront witnesses, to examine, to cross examine. We had a fair jury. We had a process which overarching was a fair process. And the jury had the facts and had extended testimony. To say that all that effort was a waste of time and to start over would be an injustice, not a justice.
>
> I will deny the motion[.]

On appeal, Aspen argues that the district court abused its discretion because it provided only limited reasoning, and there was clear and convincing evidence that Brauner's attorneys engaged in misconduct.

"The decision to grant or deny relief pursuant to Rule 60(b) is reviewed under an abuse of discretion standard." *Profits Plus Capital Mgmt., LLC v. Podesta*, 156 Idaho 873, 885, 332 P.3d

785, 797 (2014) (citing *Maynard v. Nguyen*, 152 Idaho 724, 726, 274 P.3d 589, 591 (2011)). In order to determine if the district court abused its discretion, this Court analyzes:

> Whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason.

*Lunneborg*, 163 Idaho at 863, 421 P.3d at 194 (citation omitted).

I.R.C.P. 60(b)(3) allows a district court to relieve a party from a final judgment for three reasons: "[1] fraud . . . , [2] misrepresentation, or [3] misconduct by an opposing party[.]" It appears that this Court's case law regarding I.R.C.P. 60(b)(3) only focuses on what would constitute "fraud" as to allow the district court to relieve the party from the judgment entered against it. *See, e.g.*, *Suitts v. Nix*, 141 Idaho 706, 709, 117 P.3d 120, 123 (2005) (citation omitted); *Win of Michigan, Inc. v. Yreka United, Inc.*, 137 Idaho 747, 754, 53 P.3d 330, 337 (2002) (citation omitted); *Artiach Trucking, Inc. v. Wolters*, 118 Idaho 656, 658, 798 P.2d 938, 940 (Ct. App. 1990). However, "[m]isrepresentation and misconduct are separate grounds for relief under Rule 60(b)(3) apart from fraud, and neither necessitates showing purposeful misconduct or malice." *Phillips v. Stear*, 783 S.E.2d 567, 577 (W. Va. 2016). It appears that this Court has not had the opportunity to address misrepresentation or misconduct in relation to Rule 60(b)(3).

When misconduct or misrepresentation are the grounds alleged, some jurisdictions suggest a two-part test to determine whether a party is entitled to relief from the judgment entered against it. First, the party asserting misrepresentation or misconduct must prove the misconduct or misrepresentation by clear and convincing evidence. *Phillips*, 783 S.E.2d at 577. "Misrepresentation and misconduct under Rule 60(b)(3) do not require proof of nefarious intent or purpose but can include negligent and accidental omissions during the course of discovery, or during trial." *Id.* (internal quotations and quotation marks omitted). Second, the misconduct or misrepresentation must have hindered the party's ability to fully and fairly prepare and proceed with trial. *Id.* at 578. We agree with these standards and adopt the conclusion that "to prevail under Rule 60(b)(3), the moving party must establish by clear and convincing evidence that the opposing party obtained a judgment by fraud, misrepresentation, or other misconduct, and that this conduct prevented the moving party from fully and fairly preparing or presenting a claim or a defense." *Id.* at 580.

22

In this case, the district court found that Aspen failed to prove both of these elements. First, the district court found that, based on the affidavits filed by Brauner's counsel and Moore, there was no evidence, let alone clear and convincing evidence, that there was any misconduct on the part of Brauner's counsel. Additionally, and most notably, the district court determined that Aspen was not denied the opportunity to fully and fairly litigate its case. The trial court expressly stated that there "was a fair opportunity to confront witnesses, to examine, and to cross examine. We had a fair jury. We had a process which overarching was a fair process. And the jury had the facts and had extended testimony."

The district court's findings are supported by substantial and competent evidence. Aspen was not denied the opportunity for a fair trial. As noted, there were things Aspen could have done that it did not. Once Moore was dismissed from the case, Aspen could have asked for a continuance or to have Moore placed on the verdict. Aspen had the opportunity to depose, cross-examine, and make any further motions before the court. Applying the standard articulated above, we cannot say that the district court erred in finding that Aspen had a fair opportunity to defend its case. Accordingly, we affirm the district court's order denying Aspen's Rule 60(b)(3) motion.

**E.      Brauner is not entitled to attorney fees, but is entitled to costs.**

Brauner requests attorney fees pursuant to Idaho Code section 12-121. Section 12-121 provides, "[i]n any civil action, the judge may award reasonable attorney's fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121. Although Brauner is the prevailing party on appeal, Aspen's appeal was not brought or pursued frivolously, unreasonably, or without foundation. Aspen raised valid discovery issues and appropriately challenged evidentiary rulings by the district court. Therefore, Brauner is not entitled to an award of attorney fees.

However, as the prevailing party, Brauner is entitled to costs as a matter of right. I.A.R. 40(a).

## IV.  CONCLUSION

For the foregoing reasons, we affirm the judgment entered against Aspen. We affirm the district court's decisions to allow Cook and Moore to testify. Additionally, we hold that there was no reversible error committed by the district court by excluding evidence of the settlement

agreement. Finally, we affirm the district court's order denying Aspen's 60(b)(3) motion. Brauner is entitled to costs as the prevailing party, but not attorney fees.

Justices BRODY and MOELLER CONCUR.

BEVAN, Justice, concurring:

I fully concur in the result reached by the Court today. I write separately to note that this Opinion should not be viewed by the Bar as a license to take an undisciplined approach to the limits of discovery and deadlines as set by the trial court, particularly when it comes to the timing of expert witness disclosures. As the Opinion makes clear, Judge Moody issued an amended scheduling order under I.R.C.P. 16(a) which set forth deadlines for expert witness disclosures. Even so, the parties filed two separate stipulations to extend those deadlines, the second of which the judge never approved. As we note today, the lack of clear direction coupled with the parties apparently managing these deadlines without court approval, bears some responsibility for the disputes at trial, and ultimately for the claims on appeal. The Appellants, not surprisingly, seek a hard-and-fast rule that doesn't allow for even a one workday variance. They argue that the trial judge abused its discretion by allowing witnesses to testify after late disclosures, which were, in the expressions of the moment, "grossly late" and "harmful." The Respondents, on the other hand, appreciate the tolerance shown by the trial judge, but even they recognized in their briefing that "getting supplemental disclosures with additional information [within two months of trial affects] our ability to prepare our case for trial."

The bottom line is that trial courts are forced to make tough decisions when the parties take an undisciplined approach to discovery in general, and more specifically, to expert disclosure deadlines. Courts make such decisions under an abuse of discretion standard, a high bar to overcome when challenged on appeal. *See* Cory R. Stegelmeier & Kolby K. Reddish, How to Properly Structure an Abuse of Discretion Argument, 61-May ADVOC 31, 33 (2018) (referring to the abuse of discretion standard as an "uphill battle for appellants"); *see also* Martin B. Louis, *Allocating Adjudicative Decision Making Authority Between the Trial and Appellate Levels: A Unified View of the Scope of Review, the Judge/Jury Question, and Procedural Discretion*, 64 N.C. L. Rev. 993, 1045 (1986) ("Determining a procedural determination as discretionary results in a limited scope of review on appeal, few reversals, a reduced number of appeals, and, therefore, trial level hegemony over the question.").

Here, the trial court viewed these issues within the prism of that discretion and acted "within the outer bounds of [that] discretion." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018). In another case, the trial judge might be less inclined to grant exceptions to deadlines—and in taking such an approach would also be within the proper bounds of that judge's discretion. *See Bramwell v. South Rigby Canal Co.*, 136 Idaho 648, 652, 39 P.3d 588, 592 (2001) (holding the trial court did not abuse its discretion in excluding expert testimony as the witnesses "were not disclosed until 12 days prior to trial" and "there was no legitimate excuse for the late disclosure. . . ."); *see also City of McCall v. Seubert*, 142 Idaho 580, 586, 130 P.3d 1118, 1124 (2006) (holding the trial court did not abuse its discretion in excluding expert testimony due to late disclosure.)**.** While the prospect of a continuance in these situations can perhaps be viewed as a last-ditch escape valve, such decisions can be costly. *See*, *e.g.*, I.R.C.P 54(d)(3) ("[T]he court may impose and tax costs and expenses caused by the delay against the moving party as a condition to granting the enlargement or postponement.")**;** *see also Clark v. Klein*, 137 Idaho 154, 158, 45 P.3d 810, 814 (2002) (holding the failure by a physician to supplement witness disclosures in a timely manner lead to reversal of judgment in his favor).

I recognize that modern litigation is challenging, demanding work, and that deadlines, like John Adams' facts,[7] can be "stubborn things." I write simply to encourage litigators to be judicious in managing deadlines, and to obtain the sanction of the trial court in every instance–thus helping avoid the conflict occasioned when deadlines are missed, even by just one workday.

Chief Justice BURDICK CONCURS.

---

[7] John Adams, second President of the United States, is said to have made the following argument in defense of the soldiers in the Boston Massacre Trials: "[f]acts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence." DAVID MCCULLOUGH, JOHN ADAMS 68 (2001).